USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___4/19/2019___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
MERYS URENA,                                          :
                                                      :
                          Plaintiff,                  :        **OPINION AND ORDER**
                                                      :
            -against-                                 :        18-CV-3645 (JLC)
                                                      :
NANCY A. BERRYHILL, Acting                            :
Commissioner, Social Security                         :
Administration,                                       :
                                                      :
                          Defendant.                  :
----------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Merys Urena, whose claim for benefits has been pending for more than eight

years, seeks judicial review of the latest decision by Nancy A. Berryhill, the Acting

Commissioner of the Social Security Administration, denying her claim for

Disability Insurance Benefits and Supplemental Security Income under the Social

Security Act. Urena has moved for judgment on the pleadings, requesting that the

Court reverse the Commissioner's decision and remand her case solely for the

calculation of benefits, or in the alternative, for further proceedings. The

Commissioner has cross-moved for judgment on the pleadings, contending that the

latest decision is supported by substantial evidence and should be affirmed. For the

reasons set forth below, Urena's motion is granted in part, the Commissioner's

cross-motion is denied, and the case is remanded for further administrative

proceedings to be completed within 120 days of the date of this Opinion and Order.

# I.    BACKGROUND

## A.    Procedural History

Urena filed an application for Disability Insurance Benefits and
Supplemental Security Income on November 15, 2010, alleging that she had been
disabled since January 1, 2009.  Administrative Record ("AR") dated June 26, 2018,
at 163–73, Dkt. No. 14.  The Social Security Administration ("SSA") denied Urena's
application on February 11, 2011.  *Id.* at 62–67.  Urena challenged the denial and
appeared before Administrative Law Judge Mark Solomon on January 13, 2012.  *Id.*
at 38.  In a decision issued on February 22, 2012, the ALJ concluded that Urena
was not eligible for benefits.  *Id.* at 34.  Urena filed an action in District Court,
seeking judicial review of the ALJ's February 2012 decision.  *Id.* at 403.  On
February 11, 2015, the District Court remanded the case for further consideration
of Urena's mental impairments.  *Id.* at 435–36.

In her second administrative round, Urena appeared before ALJ Solomon on
January 27, 2016.  *Id.* at 345.  In a decision issued on April 5, 2016, the ALJ again
concluded that Urena was not eligible for benefits.  *Id.* at 390.  On June 6, 2016,
Urena filed an action in District Court, seeking judicial review of the ALJ's April
2016 decision.  *Id.* at 828.  On May 16, 2017, the District Court remanded the case
for further development of the administrative record.  *Id.* at 841–42.

In her third administrative round, Urena appeared before ALJ Lori Romeo on
January 19, 2018.  *Id.* at 786.  On February 16, 2018, the ALJ found Urena was not

eligible for benefits. *Id.* at 733. The ALJ's February 2018 decision became the Commissioner's final decision on April 18, 2018. *See* Complaint ¶ 9, Dkt. No. 1.

On April 25, 2018, Urena filed the present action, seeking judicial review of the latest ALJ decision. Complaint, Dkt. No. 1. The Commissioner answered Urena's complaint by filing the administrative record on August 13, 2018. Dkt. No. 14. On November 7, 2018, Urena moved for judgment on the pleadings and submitted a memorandum in support of her motion ("Pl. Mem."). Dkt. Nos. 19–20. On February 22, 2019, the Commissioner cross-moved for judgment on the pleadings, Dkt. No. 27, and submitted an amended memorandum of law on March 14, 2019 ("Def. Mem."). Dkt. No. 34.[1] Urena replied on March 14, 2019 ("Pl. Reply."). Dkt. No. 33.[2]

## B.    The Administrative Record

### 1.    Urena's Background[3]

Urena, born in 1970, was 40 years old when she filed her application for benefits in November 2010, alleging a disability onset date of January 1, 2009 because of depression and a variety of physical ailments. AR at 163, 196, 352. She is now 48 years old. Urena was born in the Dominican Republic but has lived in the

---

[1]  Upon request, the Court granted the Commissioner's motion to strike a memorandum previously filed on February 22, 2019, Dkt. No. 28, and replace it with an amended memorandum.

[2]  The parties have consented to my jurisdiction for all purposes under 28 U.S.C. § 636(c). Dkt. No. 21.

[3]  The following background information is from Urena's application documents and her testimony during the administrative hearings.

United States since 1992. *Id.* at 43–44. She completed high school in the Dominican Republic and obtained her GED in the United States. *Id.* 43–44. She attended community college for two years but did not obtain a college degree. *Id.* at 44, 197. She does not speak English but has some limited ability to read and understand it. *Id.* at 44.

Urena is single and lives with her 12-year-old autistic son in Manhattan, *id.* at 165–66; her two other children are older and do not live with her, *id.* at 166, 352. Prior to January 2009, Urena had worked as a babysitter, and before that as a manual laborer at a factory and warehouse. *Id.* at 197, 213–17. In her application she claimed she became unable to work due to depression and a number of physical conditions. *Id.* at 196. She has been prescribed a variety of medications and treated by several doctors and medical professionals for her mental and physical conditions. *Id.* at 198–201.

### 2. Relevant Medical Evidence in the Record

Urena principally challenges ALJ Romeo's evaluation of the medical evidence with respect to Urena's mental impairment—major depressive disorder. Thus, the Court limits its recitation of the medical evidence to the findings and opinions issued by Urena's treating psychiatrist Dr. Giovanny Nunez as well as the SSA's consultative psychologists Drs. Michael Alexander and David Mahony.[4]

---

[4] Moreover, the District Court previously limited remand to Urena's mental residual functional capacity ("RFC") when, on February 11, 2015, Judge Schofield adopted Magistrate Judge Freeman's finding that the record reflected that Urena was capable of light work and that any error in the ALJ's February 2012 decision

Additionally, the Court incorporates by reference the summaries of medical evidence pertaining to psychiatrist Dr. Hilda Brewer and psychologist Dr. Luz Towns-Miranda's treatment of Urena on September 21, 2009, December 2, 2009, and February 13, 2012, which can be found in Magistrate Judge Freeman's January 5, 2015 Report and Recommendation. *Id.* at 405–08, 409–10.

### a.     Treating Psychiatrist Dr. Giovanny Nunez

Urena began seeking treatment from Dr. Nunez for her depression in February 2014 and saw her on a monthly basis until at least November 2017. *Id.* at 657–80, 1057–86. The administrative record contains more than 40 progress notes from Dr. Nunez; throughout her treatment, Urena was diagnosed with major depressive disorder. *Id.* Prior to seeing Dr. Nunez, Urena had been treated by other psychiatrists for the same diagnosis for several years. *Id.* at 681.

It is undisputed that Dr. Nunez's progress notes set forth mostly normal mental status examinations ("MSE"). *Id.* at 683; Pl. Mem. at 15; Def. Mem. at 11. However, the administrative record also includes an affirmation from Dr. Nunez dated January 16, 2016 (AR at 681–84), explaining that "the 'EXAM' segment of [Urena's] progress notes sometimes contains totally normal findings on [MSE] even on occasions when, according to the 'INTERVAL HISTORY,' [ ] Urena is

---

with respect to her physical impairments was harmless. AR at 431, 436. Thus, Urena's physical RFC need not be further considered at this juncture of the case.

symptomatic." *Id.* at 683.[5] To explain this discrepancy, Dr. Nunez reported that "the computer program [she] use[s] for progress notes is programmed to produce a normal MSE, and [she] do[es] not always remember to edit out normal findings when [she] should," and "[a]s a result, although [ ] Urena does sometimes have a fairly normal MSE, the existing records make her seem less symptomatic than she usually is." *Id.* at 683–84.

In the same affirmation, Dr. Nunez asserted that Urena suffers from "major depressive disorder, recurrent episode, severe, with psychotic features." *Id.* at 681. Dr. Nunez explained that "[t]his is a serious psychiatric illness which combines depression with mood-congruent psychosis" and that Urena tends to be severely impaired, resistant to treatment, and "more psychiatrically fragile once [she has] been stabilized." *Id.* Dr. Nunez indicated that Urena exhibits the following criteria for major depressive disorder: "(1) depressed mood; (2) markedly diminished interest in usual activities; (3) insomnia; (4) fatigue and lack of energy; (5) psychomotor retardation; (6) feelings of guilt and worthlessness[;] and (7) difficulty with concentration and memory impairment." *Id.* at 682. Dr. Nunez also indicated that Urena's symptoms are "intermittent and vary in intensity from day to day, but are usually present in some degree." *Id.* Dr. Nunez further indicated that when Urena's symptoms intensify, "she can still occasionally experience both visual and auditory hallucinations, despite being on anti-psychotic medication." *Id.* Dr. Nunez

---

[5] For example, on January 5, 2015, Urena is described in the interval history as "sad and dysphoric" but the exam section indicated "mood is euthymic with no signs of depression." AR at 668.

reported that Urena exhibits "a fair amount of anxiety and may experience panic episodes when outside the home" but does not meet the criteria for "full-blown [p]anic [d]isorder." *Id*. at 681–82.

Dr. Nunez opined that Urena's condition was stable and that her symptoms were "fairly well-controlled within the protective space of her home" but that "her condition [was] fragile." *Id*. at 682. Dr. Nunez explained that "[o]utside the home environment she is more likely to become anxious and confused, and to hear voices and exhibit paranoid thinking." *Id*. Dr. Nunez reported that several factors indicated the severity of Urena's depression: (1) the presence and persistence of psychotic symptoms; (2) the fact that she exhibits several criteria for major depressive disorder; (3) the fact that her symptoms have persisted for years at a severe level despite adherence to therapy and medication; and (4) the number of medications required to keep her stable. *Id*. at 682–83. Dr. Nunez noted that Urena's medications have prevented Urena's condition from deteriorating but that "they have not restored her ability to function outside the home." *Id*. at 683. Dr. Nunez opined that Urena's depression "renders her unable to function outside the home environment on a regular and consistent basis" and that she could not work or be able to return to work within the next 12 months. *Id*.

### b. Consultative Psychologist Dr. Michael Alexander

On January 24, 2011, consultative psychologist Dr. Alexander examined Urena and issued a report in connection with her application for benefits. *Id*. at 268–71. In his report, Dr. Alexander noted that Urena had been seeing a

psychiatrist on a monthly basis and a therapist on a weekly basis for the preceding two years, as well as taking Zoloft and Abilify, but that she had never been hospitalized for psychiatric reasons. *Id.* at 268.

With respect to her functioning, Urena claimed that she had difficulty sleeping and a loss of appetite. *Id.* at 268. Dr. Alexander indicated that she reported a history of "dysphoric mood, intermittent crying spells, and intermittent feelings of hopelessness, without suicidal intent, since 1998," but that she "[did] not endorse further symptoms of depression." *Id.* He found "no evidence of panic or manic-related symptoms, a thought disorder, or cognitive deficit." *Id.* at 269.

With respect to her mode of living, Dr. Alexander reported that Urena was able to dress, bathe, and groom herself, as well as manage money, make simple purchases, and take public transportation (noting that she had taken public transportation by herself to the appointment). *Id.* at 268, 270. He also noted that Urena's sister did the cooking and cleaning because of her medical condition. *Id.* at 270. Dr. Alexander further noted that her daily activities, for the most part, were limited to taking her son to and from school. *Id.*

With respect to her mental status, Dr. Alexander reported that Urena presented as "cooperative, friendly, and alert," and that her social skills, judgment, and insight were "adequate." *Id.* at 269–70. He found her thought processes to be "[c]oherent and goal directed" and her speech to be "adequate for normal conversation." *Id.* at 269. He also found that she exhibited no signs of hallucinations, delusions, or paranoia. *Id.* In addition, Dr. Alexander reported that

Urena's affect was appropriate, her mood was neutral, and her attention and concentration were intact. *Id.* He further found her memory skills to be intact but estimated that her intellectual functioning was below average and that her general fund of information was somewhat limited. *Id.* at 270.

In his medical source statement, Dr. Alexander indicated that Urena could follow and understand simple directions, but that she had difficulty performing simple tasks independently, "not due to psychological factors, but due to her stated medical condition." *Id.* He observed that she could maintain concentration and a regular schedule as well as learn new tasks but would have "difficulty performing some complex tasks independently," because of her "medical problems." *Id.* Dr. Alexander found that Urena could make appropriate decisions, relate adequately with others, and appropriately deal with stress. *Id.* He concluded that Urena's "longstanding psychiatric problems" were "sufficiently controlled, and in themselves, [did] not significantly interfere with [her] ability to function on a daily basis." *Id.* Dr. Alexander diagnosed Urena with depressive disorder. *Id.* at 271.

### c.    Consultative Psychiatrist Dr. David Mahony

On November 13, 2015, consultative psychologist Dr. Mahony conducted an examination of Urena and issued a report in connection with her application. *Id.* at 538–41. In his report, Dr. Mahony noted that Urena had never been hospitalized for psychiatric reasons but had been receiving psychiatric treatment since 2008. *Id.* at 538. With respect to her functioning, Urena claimed she had insomnia and a loss of appetite. *Id.* Dr. Mahony indicated that Urena had symptoms of depression,

"including a depressed mood, hopelessness, loss of interests, loss of energy, diminished self-esteem, and diminished sense of pleasure." *Id.* However, she denied any past or present suicidality, emotional problems, or thought disorders. *Id.* Dr. Mahony found that Urena had "cognitive deficits secondary to her symptoms of depression" as well as "short-term memory deficits and difficulty learning new material." *Id.* at 538–39. With respect to her mode of living, Dr. Mahony reported that Urena was able to dress, bathe, and groom herself, as well as take care of her child. *Id.* at 540.

With respect to her mental status, Dr. Mahony reported that Urena appeared cooperative, groomed, and casually dressed. *Id.* at 539. He found her judgment to be good, her thought processes to be "coherent and goal directed," and her speech to be "fluent and clear." *Id.* He also found that Urena exhibited no signs of hallucinations, delusions, or paranoia. *Id.* However, Dr. Mahony reported that Urena's insight was poor, her affect was depressed, her mood was dysthymic, and her attention and concentration were impaired due to cognitive limitations. *Id.* at 539–40. He found her memory skills to be impaired due to symptoms of depression and estimated that her cognitive functioning was below average. *Id.* He also noted that her general fund of information was limited. *Id.* at 540.

In his medical source statement, Dr. Mahony indicated that Urena could follow and understand simple instructions as well as perform simple tasks independently. *Id.* She also had no difficulties performing complex tasks, making appropriate decisions, relating to others, and dealing with stress. *Id.* However, she

had mild difficulties maintaining attention, concentration, and a regular schedule, and moderate difficulties with learning new tasks. *Id.* Dr. Mahony observed that Urena's difficulties were due to psychiatric symptoms and that those symptoms would interfere with her ability to function on a daily basis. *Id.* Dr. Mahony diagnosed Urena with "major depressive disorder, moderate." *Id.*

### 3. ALJ Hearings

At all three hearings, Urena appeared with counsel and testified with the help of a Spanish interpreter. *Id.* at 38, 345, 786.

### a. January 13, 2012 Hearing

During her first hearing, Urena's testimony focused on her depression and psychological impairments. *Id.* at 47. She explained that she was "always crying," did not want to be around people, did not have any friends, and "want[ed] to run away." *Id.* at 51–52. She reported that for many years, she has "hear[d] voices." *Id.* at 50. Urena testified that she saw a psychiatrist about once a month and a counselor about once a week for psychiatric treatment; she also took medication for her psychiatric conditions but reported that it did not always help. *Id.* at 46, 50.

With respect to her functioning, Urena testified that she stopped working when her youngest son was diagnosed with autism because she "just broke down," "had to focus on [her] child," and "couldn't work anymore." *Id.* at 45–46. She reported that she could take care of her son as well as dress, bathe, wash her clothes, cook "easy things," and feed herself, but she needed her sister's help with household chores such as cleaning and cooking, and at times, with caretaking for

her son.  *Id.* at 48, 52.  She also testified that she could not travel by herself because her conditions affected her memory and she was "held up" in 2003 and it "always fe[lt] like somebody [was] following [her]."  *Id.* at 49, 53.

After Urena testified, the ALJ took testimony from vocational expert Melissa Fass-Karlin.  *Id.* at 54–57.  Fass-Karlin testified that someone with Urena's age, education, and work experience, with certain exertional and non-exertional limitations, would be unable to perform Urena's past work as a babysitter.  *Id.* at 55.  But to the extent the same hypothetical individual could perform medium work, she would be able to perform the jobs of cleaner, meat clerk, and hand packager; and if she could perform light work, she would be able to perform the jobs of marker and bagger.  *Id.* at 56.  However, Fass-Karlin testified that if the hypothetical individual was unable to "maintain attention and concentration for rote work due to depressive symptoms," there would be no jobs available that the individual would be able to perform.  *Id.*

### b.  January 27, 2016 Hearing

During her second hearing, Urena testified about her psychological impairments and said that she "see[s] a lot of shadows [and] visions," "cr[ies] over everything," "do[esn't] like to be around people," and "shut[s] [her]self in."  *Id.* at 358.  She also testified that she has problems with her memory.  *Id.* at 361.

With respect to her functioning, Urena testified that she is unable to travel alone (unless she is traveling short distances) and has been traveling with her sister because she gets lost when traveling far distances.  *Id.* 352–53.  She reported that

she dresses, showers, and grooms herself but that her sister helps with household chores such as shopping, cooking, cleaning, and laundry. *Id.* at 353–54. Urena takes care of her youngest son by walking him to and from school (located four blocks from where they live), occasionally taking him to the park, attending parent-teacher conferences every three months, helping him with his homework, as well as feeding, bathing, and dressing him. *Id.* at 355–56, 358–59. However, her sister helps with caretaking for her son by bathing, feeding, and babysitting him about three times a week. *Id.* at 359–60. Urena also testified that she goes to church about three times a month. *Id.* at 354.

After Urena testified, the ALJ took testimony from vocational expert Marian Green. *Id.* at 364–68. Green testified that someone with Urena's age, education, and work experience could perform light to medium jobs as a cleaner of transportation equipment, packager, hand packager, price marker, shoe packer, grocery bagger, floor worker, assembly worker, and laundry worker. *Id.* at 364–67. However, Green testified that if the hypothetical individual was unable to "maintain attention and concentration for rote work" or "tolerate stress at any level" and was expected to miss more than one day of work per month, there would be no jobs available that the individual would be able to perform. *Id.* at 367–68.

### c.    January 19, 2018 Hearing

Prior to her third hearing, on January 4, 2018, Urena's counsel requested that the ALJ subpoena the SSA's psychiatric consultative examiners and make them available for cross-examination. *Id.* at 790, 945–49. At the outset of the

hearing, the ALJ denied counsel's application because of "logistical difficulties" and the fact that Urena could call her own experts and submit evidence from her own doctors to challenge the consultative examiner's reports. *Id.* at 790–92.

During Urena's testimony, she confirmed that she had not been working since January 2009 due to her alleged disabilities. *Id.* at 799. She explained that she stopped working because she could no longer "be around people" due to her depression and needed to care for her autistic son. *Id.* at 802–03. She described her depression as "severe" and testified that she "was always crying all the time" and "didn't want to bathe or cook or clean." *Id.* at 803–04. Urena "always needed [her] sister to come over and help," especially with caretaking duties for her autistic son. *Id.* at 803–04, 812. She acknowledged that her medications helped her to stop crying and feel more relaxed. *Id.* at 804.

After Urena testified, the ALJ took testimony from vocational expert Rachel Duchon. *Id.* at 816–23. In light of Urena's testimony regarding her work history, Duchon testified that someone with Urena's age, education, and work experience would be able to perform the position of a merchandise marker, garnisher of baked goods, and small products assembler. *Id.* at 819–21. However, Duchon testified that if the hypothetical individual was limited to light, unskilled work, with certain exertional limitations, but could not work with the public, there would be no jobs available in the national economy that the individual would be able to perform. *Id.* at 822.

## II.    DISCUSSION

### A.    Standard of Review

#### 1.    Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted). *See also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (same).

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault,* 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g).

In certain circumstances, the court may remand a case solely for the calculation of benefits, rather than for further administrative proceedings. "In . . . situations[ ] where this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, [the court has] opted simply to remand for a calculation of benefits." *Michaels v. Colvin,* 621 F. App'x 35, 38–39 (2d Cir. 2015) (quoting *Rosa v. Callahan,* 168 F.3d 72, 83 (2d Cir. 1999)) (internal quotation marks omitted). The court may remand solely for the calculation of benefits when "the records provide[ ] persuasive evidence of total disability that render[s] any further proceedings pointless." *Williams v. Apfel,* 204 F.3d 48, 50 (2d Cir. 1999). However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

### 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.' " *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a.     Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step inquiry. *Cichocki v. Astrue*, 729 F.3d 172, 173 n.1 (2d Cir. 2013); 20 C.F.R. § 404.1520.[6]  First, the Commissioner must establish whether the claimant is presently employed.  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is unemployed, at the second step the Commissioner determines whether the claimant has a "severe" impairment restricting her ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix 1 of Subpart P of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is considered disabled.  *Id.*; 20 C.F.R. § 404.1520(d).  If not, the Commissioner continues to the fourth step and determines whether the claimant has the RFC to perform her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work.  20 C.F.R. § 404.1520(a)(4)(v).

---

[6]  In 2017, new SSA regulations came into effect.  These regulations apply only to claims filed with the SSA on or after March 27, 2017.  Accordingly, because Urena's claims were filed in 2010, the Court applies the regulations that were in effect when Urena's claims were filed.  *See, e.g.*, *Rousey v. Comm'r of Soc. Sec.*, 16-CV-9500 (HBP), 2018 WL 377364, at *8 n.8 & *12 n.10 (S.D.N.Y. Jan. 11, 2018) (noting 2017 amendments to regulations but reviewing ALJ's decision under prior versions); *O'Connor v. Berryhill*, 14-CV-1101 (AVC), 2017 WL 4387366, at *17 n.38 (D. Conn. Sept. 29, 2017) (same); *Luciano-Norman v. Comm'r of Soc. Sec.*, 16-CV-1455 (GTS) (WBC), 2017 WL 4861491, at *3 n.2 (N.D.N.Y. Sept. 11, 2017) (same), *adopted by*, 2017 WL 4857580 (N.D.N.Y. Oct. 25, 2017); *Barca v. Comm'r of Soc. Sec.*, 16-CV-187, 2017 WL 3396416, at *8 n.5 (D. Vt. Aug. 8, 2017) (same).

The claimant has the burden at the first four steps. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel,* 530 U.S. 103, 110–11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history. *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§ 404.1512(d)–(f)). This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is

supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, 09-CV-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)). The ALJ must develop the record even where the claimant has legal counsel. *See, e.g.*, *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Remand is appropriate where this duty is not discharged. *See, e.g.*, *Moran,* 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c.   Treating Physician Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(c), 416.927(d)) (internal quotation marks omitted). A treating physician's opinion is given controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case record." 20 C.F.R.

§ 404.1527(c)(2). The regulations define a treating physician as the claimant's "own

physician, psychologist, or other acceptable medical source who provides [the

claimant] . . . with medical treatment or evaluation and who has, or has had, an

ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502.

Deference to such medical providers is appropriate because they "are likely to be the

medical professionals most able to provide a detailed, longitudinal picture of [the]

medical impairment(s) and may bring a unique perspective to the medical evidence

that cannot be obtained from the objective medical evidence alone or from reports of

individual examinations." 20 C.F.R. § 404.1527(c)(2).

A treating physician's opinion is not always controlling. For example, a legal

conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling,"

because such opinions are reserved for the Commissioner. *Guzman v. Astrue*,

09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R.

§§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.

1999) ("A treating physician's statement that the claimant is disabled cannot itself

be determinative."). Additionally, where "the treating physician issued opinions

that [were] not consistent with other substantial evidence in the record, such as the

opinion of other medical experts, the treating physician's opinion is not afforded

controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran

v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted)

(alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the

treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician if clinical findings are inadequate). As a result, "the 'treating physician rule' is inextricably linked to a broader duty to develop the record. Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination." *Lacava v. Astrue*, 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), *adopted by*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see* 20 C.F.R. § 404.1527(c)(2). If, based on these considerations, the ALJ declines to give controlling weight to the treating physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned to the treating source. *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133 (responsibility of determining weight to be afforded does not "exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)). The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted). Indeed, "[c]ourts have not hesitate[d] to remand [cases] when the Commissioner has not provided good reasons." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

## B. The ALJs' Decisions

### 1. The ALJ's February 22, 2012 Decision

In February 2012, ALJ Solomon issued a decision denying Urena's application. AR at 26–34. At step one of the disability analysis, the ALJ found that Urena had not engaged in substantial gainful activity since January 1, 2009. *Id.* at 28. At step two, he found Urena had the following severe impairments: hypertension, hypothyroidism, obesity, gastritis, mild degenerative joint disease of the right knee, and depressive disorder. *Id.* At step three, he found that Urena's

impairments did not meet or medically equal a listed impairment. *Id.* at 29. In particular, he found that Urena's depressive disorder did not meet a listed impairment because she had only mild restrictions of daily living activities, mild difficulties in maintaining social function, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* at 29–30. In addition, the ALJ found that there was "no evidence of decompensation, the likelihood of future decompensation, or the inability to live outside a highly supportive arrangement." *Id.* at 30.

At step four, the ALJ found that Urena retained the RFC to perform medium work with certain limitations. *Id.* In making this determination, he stated that he had "considered [Urena's] symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* He concluded that while Urena's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Urena's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent" with the assessed RFC. *Id.* at 31.

After determining Urena's RFC, the ALJ found that Urena was unable to perform her past relevant work due to her non-exertional impairments. *Id.* at 33. However, at step five, the ALJ—considering Urena's age, education, work experience, and RFC and relying on the vocational expert's testimony—found that Urena was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy," specifically as a hand packager,

cleaner, and meat clerk. *Id.* at 34. Thus, the ALJ concluded that Urena was not disabled within the meaning of the Social Security Act. *Id.*

Urena sought judicial review of the ALJ's decision and the District Court, in February 2015, remanded the case for further administrative proceedings. *Id.* at 435–36. Specifically, upon remand, the ALJ was directed to consider "all the medical opinion evidence in the record with respect to the nature and severity of Urena's mental impairments—including those contained in the 2009 evaluations, Dr. Alexander's consultative examination, and Dr. Brewer's 2012 evaluation . . . including the treating physician rule and the criteria for weighing medical opinion evidence . . . ." *Id.* at 432, 436. In addition, the ALJ was directed to reconsider "[Urena's] own statements, including her hearing testimony and function report [ ], in light of all of the medical evidence in the [r]ecord." *Id.* at 432. However, the District Court found that the ALJ's decision regarding Urena's physical ability did not need to be reviewed or reconsidered by the ALJ. *Id.* at 432.

### 2. The ALJ's April 5, 2016 Decision

In April 2016, the same ALJ issued a decision again denying Urena's application. *Id.* at 376–90. At step one, the ALJ found that Urena had not engaged in substantial gainful activity since January 1, 2009. *Id.* at 378. At step two, he found Urena had the following severe impairments: major depressive disorder, hypertension, hypothyroidism, obesity, gastritis, degenerative joint disease of the right knee, a history of vertigo, and migraines. *Id.* at 379. At step three, he found that Urena's impairments did not meet or medically equal a listed impairment. *Id.*

In particular, he found that Urena's major depressive disorder did not meet a listed impairment because she had only mild restrictions of daily living activities and moderate difficulties in maintaining social function, concentration, persistence, or pace. *Id.* at 379–80. In addition, the ALJ found that Urena experienced "no episodes of decompensation, which have been of extended duration." *Id.* at 380.

At step four, the ALJ found that Urena retained the RFC to perform medium work with certain limitations. *Id.* In making this determination, he stated that he had "considered [Urena's] symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* He concluded that while Urena's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Urena's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the record." *Id.* at 385. The ALJ also stated that the RFC assessment was "supported by the treatment records and comprehensive progress notes showing generally normal to mild findings regarding both [Urena's] physical and mental symptoms, her conservative treatment history, the findings and opinions of treating, examining, and reviewing sources . . . and some of [Urena's] reported activities including especially the care of her son, which necessitated her leaving work." *Id.* at 388.

After determining Urena's RFC, the ALJ found that Urena was unable to perform her past relevant work as a "child care monitor." *Id.* at 388. However, at step five, the ALJ—considering Urena's age, education, work experience, and RFC

and relying on the vocational expert's testimony—found that Urena was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy," specifically as a price marker, assembly worker, and packer. *Id.* at 389. Thus, the ALJ concluded that Urena was not disabled within the meaning of the Social Security Act. *Id.* at 390.

Urena sought judicial review of the ALJ's decision and the District Court, in May 2017, remanded the case for further administrative proceedings. *Id.* at 840. The District Court found that there were gaps in the administrative record that were not properly developed—specifically, those concerning Dr. Nunez's treatment notes and MSE findings. *Id.* The District Court found that "ALJ [Solomon] erred in rejecting Dr. Nunez's diagnosis without first attempting to fill the clear gaps as a result of the erroneous progress notes" and "[p]resented with Dr. Nunez's testimony regarding the computer program and the potentially incorrect MSE findings in the treatment notes, the ALJ should have inquired further." *Id.* at 838–39.

### 3. The ALJ's February 16, 2018 Decision

In February 2018, a different ALJ issued a decision denying Urena's application. *Id.* at 720–33. At step one, the ALJ found that Urena had not engaged in substantial gainful activity since January 1, 2009. *Id.* at 723. At step two, she found Urena had the following severe impairments: "major depressive disorder, degenerative joint disease, obesity, and a history of vertigo and headaches." *Id.* At step three, she found that Urena's impairments did not meet or medically equal a listed impairment. *Id.* In particular, she found that Urena's mental impairments

did not meet a listed impairment because she had only moderate limitations in understanding, remembering, applying information, interacting with others, and adapting or managing herself. *Id.* at 724. She also found that Urena had only moderate limitations with respect to concentration, persistence, and pace. *Id.*

At step four, the ALJ found that Urena retained the RFC to perform light work with certain limitations. *Id.* In making this determination, she stated that she had "considered [Urena's] symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* She concluded that while Urena's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," Urena's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 730.

In reaching this conclusion, the ALJ explained that she had reviewed the medical evidence and evaluated the medical opinions in the record. She accorded "some weight" to the opinions of consultative psychologists Dr. Alexander and Dr. Mahony because they were from examiners familiar with Social Security Administration functionality. *Id.* at 730–31. Specifically, the ALJ afforded "some weight" to Dr. Alexander's conclusion that Urena's "mental issues do not interfere with her activities of daily living" and his opinion that she "could perform simple tasks and relate adequately with others, which would allow her to work at jobs with only occasional contact with supervisors and co-workers." *Id.* at 730. She also

afforded "some weight" to Dr. Mahony's opinion that "[Urena's] symptoms do not interfere with her ability to perform simple tasks and she has moderate problems performing complex tasks." *Id.* at 731.

In her decision, the ALJ also discussed treating psychiatrist Dr. Nunez's January 2016 affirmation, but did not assign any weight to her opinions. *Id.* at 727–28, 731. With respect to Dr. Nunez's finding that Urena had anxiety and depression and was stable but fragile, the ALJ concluded: "Dr. Nunez's records do not support [her] opinion, which is also not supported by the results of the consultative examinations." *Id.* at 731.

After determining Urena's RFC, the ALJ found that in comparing her RFC with the demands of her past relevant work, Urena is capable of performing her past relevant work as a merchandise marker. *Id.* at 732. Additionally, at step five, the ALJ—considering Urena's age, education, work experience, and RFC and relying on the vocational expert's testimony—found that "there are also other jobs that exist in significant numbers in the national economy that [Urena] [ ] can perform" and Urena "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy," specifically as a warehouse support worker, garnisher, and small product assembler. *Id.* at 732–33. Therefore, the ALJ concluded that Urena was not disabled within the meaning of the Social Security Act. *Id.* at 733.

**C.  Analysis**

Urena argues that the latest ALJ decision should be reversed and her claim should be remanded solely for the calculation of benefits.  Pl. Mem at 34–35.  In the alternative, she seeks a remand for further administrative proceedings, with a court order directing the ALJ to issue subpoenas compelling the testimony of consultative psychologists Drs. Alexander and Mahony.  *Id.*  Urena argues that she is entitled to such relief because: (1) the ALJ violated the treating physician rule (*id.* at 17–27); and (2) the ALJ's refusal to issue subpoenas for the cross-examination of the SSA's consultative psychologists constituted an abuse of discretion (*id.* at 28–34).

The Commissioner disagrees and counters that the ALJ's decision finding that Urena was not disabled is supported by substantial evidence.  Def. Mem. at 22–33.  She also argues that the ALJ did not abuse her discretion in declining to issue subpoenas to the consultative psychologists.  *Id.* at 33–34.  The Commissioner contends that if the Court finds any error in the ALJ's decision, remand for further administrative proceedings, as opposed to a calculation and payment of benefits, is appropriate because the record does not provide persuasive evidence of Urena's total disability.  *Id.* at 34–35.  In her reply, Urena argues that the opinion of her treating psychiatrist Dr. Nunez is entitled to controlling weight (or at least more weight than any other medical opinion) (Pl. Reply at 1–8), and reiterates her point regarding the ALJ's alleged abuse of discretion (*id.* at 9–12).

For the reasons discussed below, the Court concludes that the ALJ did not comply with the treating physician rule or adequately develop the record.  Thus, the

case should be remanded for further administrative proceedings.  However, the Court finds that the ALJ did not abuse her discretion in not issuing subpoenas for the SSA's consultative psychologists and leaves the question of whether they should be issued for a further administrative hearing to the ALJ's discretion.

### 1. The ALJ Did Not Properly Develop the Record or Comply with the Treating Physician Rule

On May 16, 2017, the District Court found that "there [were] gaps in the administrative record that were not properly developed by the ALJ—specifically, those concerning Dr. Nunez's treatment notes and [MSE] findings," and accordingly, remanded Urena's case for further proceedings.  AR at 841.  In particular, the court found that "the ALJ erred in rejecting Dr. Nunez's diagnosis without first attempting to fill the clear gaps as a result of the erroneous progress notes" and "[p]resented with Dr. Nunez's testimony regarding the computer program and the potentially incorrect MSE findings in the treatment notes, the ALJ should have inquired further."  *Id.* at 838–39.

While the latest ALJ decision acknowledges that the case was remanded "for the hearing office[r] to develop the records from Dr. Nunez," *id.* at 720, there is no evidence that the ALJ attempted to contact Dr. Nunez or otherwise comply with the District Court's May 2017 Memorandum Opinion and Order.  The medical evidence with respect to Dr. Nunez was supplemented only by Urena's submission of her progress notes covering the period since the January 2016 hearing.  *Id.* at 1057–86.

Dr. Nunez's admittedly inaccurate progress notes are no doubt concerning.  However, faced with such "inconsistencies in a treating physician's report, the ALJ

bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." *Lazo-Espinoza v. Astrue*, 10-CV-2089 (DLI), 2012 WL 1031417, at *13 (E.D.N.Y. Mar. 27, 2012).  For example, the ALJ should have requested a medical source statement from Dr. Nunez.  *See, e.g., Pettaway v. Colvin*, 12-CV-2914 (NGG), 2014 WL 2526617, at *5 (E.D.N.Y. June 4, 2014) ("district courts within this Circuit have routinely recognized that ALJs have an affirmative duty to request medical source statements from a plaintiff's treating sources in order to develop the record, regardless of whether a plaintiff's medical record otherwise appears complete") (citation omitted).  "Courts in the Southern District of New York have recognized that the ALJ's obligation to develop the record is particularly important where an applicant alleges he or she is suffering from a mental illness." *Matos v. Berryhill*, 13-CV-5062 (KMK) (LMS), 2017 WL 2371395, at *15 (S.D.N.Y. May 5, 2017) (internal quotation marks, alteration, and citation omitted), *adopted by* 2017 WL 2364368 (S.D.N.Y. May 20, 2017).

Although Urena appeared at the January 2018 hearing with counsel who confirmed that the record from Dr. Nunez was complete, AR at 795–96, the ALJ should have affirmatively requested clarifying information from Dr. Nunez (especially in light of the District Court's May 2017 directives).  *See, e.g., Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (ALJ's duty to develop the record and seek additional information exists independently from claimant's obligation to present evidence on his or her own behalf).  "The ALJ's unexplained

failure to seek additional records from [the treating physician] warrants the remand of this matter." *Ulloa v. Colvin*, 13-CV-4518 (ER), 2015 WL 110079, at *13 (S.D.N.Y. Jan. 7, 2015) (citation omitted). [7]

The ALJ's analysis also violates the treating physician rule. First, the ALJ did not assign any weight to Dr. Nunez's opinion. *See, e.g., Crothers v. Colvin*, 13-CV-4060 (VEC) (KNF), 2015 WL 1190167, at *2 (S.D.N.Y. Mar. 16, 2015) (remand where ALJ failed to assign any weight to plaintiff's treating physician's report); *McClean v. Astrue*, 650 F. Supp. 2d 223, 228 (E.D.N.Y. 2009) (ALJ's failure to weigh findings of a treating physician violates treating physician rule). While acknowledging that Dr. Nunez was Urena's treating psychiatrist, the ALJ's entire analysis of her opinion reads as follows: "Dr. Nunez . . . wrote in January 2016 that [Urena] has anxiety and depression and is stable but fragile. Dr. Nunez's records do not support this opinion, which is also not supported by the results of the consultative examinations." AR at 731. Thus, it is impossible to determine what weight, if any, the ALJ gave to Dr. Nunez's opinion. This is especially troubling because "even when a [treating] physician's opinion is not controlling, it is at least entitled to some weight." *Munoz v. Colvin*, 13-CV-1269 (VSB) (HBP), 2014 WL 4449788, at *12 (S.D.N.Y. Sept. 10, 2014) (collecting cases). *See also Santiago v.*

---

[7] Although Urena seeks the Court's ruling on the question of "whether a medical opinion otherwise well-supported by medically acceptable clinical and laboratory diagnostic techniques can be disregarded because of inadequate office notes," Pl. Mem. at 1, this issue does not need to be reached by the Court at this juncture of the case because of the ALJ's more fundamental failure to develop the record with respect to Dr. Nunez.

*Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources.") (internal quotation marks and citations omitted).

Second, the ALJ recounts Urena's counsel's explanation that "[Dr. Nunez's] notes [were] not always accurate because the doctor autoposts," and points out that "there [was] no evidence that [Dr. Nunez] created supplemental records correcting her entries," AR at 731, but if the ALJ found that Dr. Nunez's opinion lacked support, she was required to seek additional information from her before rejecting her opinion. *See, e.g., Munoz*, 2014 WL 4449788, at *13 (if ALJ finds a treating physician's opinion lacking in support, "he or she must seek additional information from the treating physician *sua sponte* before rejecting his or her opinion") (collecting cases). As discussed above, there is no indication that the ALJ made any attempts to contact Dr. Nunez before implicitly rejecting her opinion.

Finally, the ALJ erred by failing to explain in sufficient detail her reasons for rejecting Dr. Nunez's opinion. After summarizing her progress notes, AR at 727–28, the ALJ stated that Dr. Nunez's opinion was not supported by her records or the reports of the consultative psychologists. *Id.* at 731. It is undisputed that Dr. Nunez's "notes are not always accurate because [she] autoposts." *Id.* However, the ALJ failed to explain why she credited the reports of Drs. Alexander and Mahony, each of whom examined Urena on only one occasion, over the opinion of Dr. Nunez

34

who treated Urena on a monthly basis from February 2014 to at least November 2017—especially in light of the fact that "[t]he [t]reating [p]hysician [r]ule recognizes that a physician who has a long history with a patient is better positioned to evaluate the patient's disability than a doctor who observes the patient once for the purposes of a disability hearing." *Santiago*, 441 F. Supp. 2d at 629. *See also* 20 C.F.R. § 404.1527(c)(2)(i) ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source."). Additionally, "[t]he mandate of the treating physician rule to give greater weight to the opinions of doctors who have a relationship with a plaintiff is particularly important in the mental health context." *Rodriguez v. Astrue*, 07-CV-534 (WHP) (MHD), 2009 WL 637154, at *26 (S.D.N.Y. Mar. 9, 2009). "Because good reasons must be given and comprehensively explained before assigning the opinion of a claimant's treating physician less than controlling weight, the ALJ's failure to explain [her] reasoning constitutes legal error." *Munoz*, 2014 WL 4449788, at *13 (citations and internal quotation marks omitted).

In sum, this case must be remanded once again because the ALJ failed to properly develop the record or comply with the treating physician rule. On remand, the ALJ should request additional documentation or testimony from Dr. Nunez, including a medical source statement that would provide, *inter alia*, her opinion about the severity of Urena's major depressive disorder and the limitations of her

disability; reevaluate Dr. Nunez's findings and opinions in accordance with the applicable regulations upon a complete record; and specifically assign the weight to be given to Dr. Nunez's assessment of Urena.[8]  In addition, the ALJ should consider and weigh all the medical opinion evidence in the record with respect to the nature and severity of Urena's mental impairment, including those contained in the 2009 and 2012 evaluations from Drs. Brewer and Towns-Miranda, neither of whom are mentioned in the ALJ's findings.[9]

### 2.  The ALJ Did Not Abuse Her Discretion in Not Issuing Subpoenas to SSA's Consultative Examiners

"The issuance of subpoenas in social security administrative proceedings is governed primarily by 20 C.F.R. § 404.950(d)(1), which provides . . . [that] [w]hen it is *reasonably necessary for the full presentation of a case,* an administrative law judge or a member of the Appeals Council *may,* . . . at the request of a party, issue

---

[8]  Urena urges the Court to consider remanding the case solely for the calculation of benefits.  Pl. Mem. at 34–35; Pl. Reply at 12–13.  While a court may do so when "the records provide[ ] persuasive evidence of total disability that render[s] any further proceedings pointless," *Williams*, 204 F.3d at 50, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [courts] have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts*, 94 F.3d at 39 (quoting *Parker*, 626 F.2d at 235) (alteration in original).  Thus, only where the record is complete and provides persuasive proof of disability, can the courts remand solely for the calculation of benefits.  Given the incompleteness of the record here, the Court cannot remand solely for the calculation of benefits at this time.

[9]  Although the ALJ concluded that Urena was not disabled from the alleged disability onset date of January 1, 2009 through the date of her decision on February 16, 2018, AR at 721, she only cursorily referred to the 2009 and 2012 evaluations in her decision, *id.* at 725, 727, so it is not clear to what extent, if any, the ALJ considered this evidence.

subpoenas for the appearance and testimony of witnesses and for the production of books, records, correspondence, papers, or other documents that are material to an issue at a hearing." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (emphasis in original). "The plain language of this section clearly places the decision to issue a subpoena within the sound discretion of the ALJ." *Id.*

"A decision not to subpoena is subject to 'abuse of discretion' review." *Oliphant v. Astrue*, 11-CV-2431 (KAM), 2012 WL 3541820, at *23 (E.D.N.Y. Aug. 14, 2012) (citing *Yancey*, 145 F.3d at 113 (concluding that the ALJ fairly chose not to subpoena where a subpoena would not have added "anything of value" and no reasons existed to suspect the physician's reports were biased or inaccurate)). Courts find no abuse of discretion when the ALJ "allowed [plaintiff] a fair and meaningful opportunity to present her case and [ ] had no indication that [the physician's] reports were inaccurate or biased or that subpoenaing [the physician] would have added anything of value to the proceedings." *Yancey*, 145 F.3d at 113 .

Although Urena contends that the ALJ's denial of her request for subpoenas "violated [her] rights under the regulations, as well as her Fifth Amendment right to due process," Pl. Mem. at 2, "the right to due process in a social security disability hearing does not require that a reporting physician be subpoenaed any time a claimant makes such a request." *Yancey*, 145 F.3d at 111. Indeed, "practical concerns strongly militate against adopting a rule establishing an absolute right to subpoena reporting physicians," including "unnecessarily increas[ing] the financial and administrative burdens of processing disability claims while diluting the ALJ's

discretion in how [s]he develops the record." *Id.* at 113. *See also Baker v. Colvin*, 1:15-CV-388 (MAT), 2017 WL 5589483, at *4 (W.D.N.Y. Nov. 21, 2017) ("it is appropriate to consider the burdensome effects of the costs of paying reporting physicians to testify in every case, as well as the likely decline in physicians willing to provide reports with the knowledge that a subpoena would follow virtually every report submitted") (internal quotation marks and citations omitted).

Here, Urena's counsel requested subpoenas requiring Drs. Alexander and Mahony to attend the January 2018 hearing and be available for cross-examination to discuss their professional qualifications, their roles in creating their respective reports, and "whether awareness of certain facts, not reflected in their reports, might change their opinions about Urena's diagnosis and psychiatric RFC." Pl. Mem. at 29–30; AR at 945–49. Aside from the fact that he has offered no evidence or authority to substantiate these lines of cross-examination, counsel has not adequately demonstrated, on Urena's behalf, that these reports were "incomplete, inaccurate, or tainted by prejudice" or that subpoenaing Drs. Alexander and Mahony "would have added anything of value to the proceedings." *Baker*, 2017 WL 5589483, at *4 (citation omitted).

Although Urena's counsel calls into question the content and creation of Dr. Alexander and Mahony's reports, contending that "there were significant indications that they may not have written them," Pl. Mem. at 1, he does not provide adequate support for  this contention, offering only speculative assertions such as: "[i]t is certainly possible, perhaps even likely, that it is [the claimant's

questionnaire], and not the psychologist's conversation with the claimant, that is the source of much of the information contained in the CE report," AR at 947–48, and "the consultant may not even see these [questionnaires], and [ ] it is certainly a possibility that the reports themselves are drafted by a non-physician employee of the business with which the state agency contracts for the reports," Pl. Mem. at 29–30.

Additionally, counsel argues that the ALJ's refusal to issue subpoenas was "completely unexplained," *id.* at 31, but she, in fact, denied Urena's request because of the "administrative problem[s]" and "logistical difficulties" associated with subpoenaing consultative examiners and because Urena could exercise her option to call her own experts to challenge the consultative psychologists' reports. AR at 791. "[T]he ALJ had the discretion to determine that in-person testimony was unlikely to add new or valuable material information" and "[t]here is no reason to suspect, and [Urena] does not allege, that either [physician] submitted biased or inaccurate opinions." *Oliphant*, 2012 WL 3541820, at *23. Thus, Urena has not established that the ALJ abused her discretion in not issuing subpoenas to consultative psychologists Drs. Alexander and Mahony.

### 3. The ALJ Must Resolve Urena's Claim Within 120 Days

The final matter which the Court must address is the question of delay. Urena applied for benefits in November 2010, more than eight years ago. As courts have acknowledged, disability determinations are "often painfully slow" and "a remand for further evidentiary proceedings (and the possibility of further appeal)

could result in substantial, additional delay." *Michaels,* 621 F. App'x at 41 (quoting *Butts,* 388 F.3d at 387). Understanding the continued hardship faced by the claimant, courts have seen fit to impose deadlines on the Commissioner to make final decisions. *See, e.g., Michaels*, 621 F. App'x at 41 (120 days to finish further proceedings); *Butts v. Barnhart*, 416 F.3d 101, 103 (2d Cir. 2005) (120 days to finish further proceedings); *Morales v. Berryhill*, 17-CV-9315 (JLC), 2018 WL 6381049, at *26 (S.D.N.Y. Dec. 6, 2018) (120 days to finish further proceedings); *Gonzalez-Cruz v. Comm'r of Soc. Sec.,* 16-CV-6613 (MWP), 2018 WL 3151656, at *3 (W.D.N.Y. June 27, 2018) (120 days to finish further proceedings)*; Cruz v. Colvin*, 15-CV-1463 (AJP), 2015 WL 5813158, at *1 (S.D.N.Y. Oct. 6, 2015) (120 days to finish further proceedings); *Turkus v. Astrue*, 11-CV-3887 (FB), 2012 WL 3877617, at *5 (E.D.N.Y. Sept. 7, 2012) (60 days to finish further proceedings).

Mindful of Urena's understandable frustration with the protracted administrative process, this Court will also impose a deadline such that the ALJ must complete all further administrative proceedings within 120 days of the date of this Opinion and Order. This deadline is additionally necessary in light of the "egregious" delay that Urena has experienced. *Hilsdorf v. Comm'r of Soc. Sec.,* 724 F. Supp. 2d 330, 355 (E.D.N.Y. 2010). In the aforementioned cases where courts have imposed deadlines after acknowledging long delays, the claimants had applied for benefits five to eight years prior to the courts' decision. *See, e.g., Michaels*, 621 F. App'x at 41 (8 years); *Cruz*, 2015 WL 5813158, at *4 (6 years); *Turkus*, 2012 WL

3877617, at *5 (6 years).  Urena's wait of more than eight years makes the imposition of a deadline all the more imperative.

Finally, if upon remand the ALJ denies Urena's claim, the Commissioner must issue a final decision within 60 days of any appeal from that denial.  If the Commissioner does not adhere to the deadlines set forth herein, and any delay is not attributable to Urena, a calculation of benefits owed to Urena must be made immediately.  *See Gonzalez-Cruz,* 2018 WL 3151656, at *3 (imposing same deadlines and conditions); *Turkus,* 2012 WL 3877617, at *3 (same).

## III.    CONCLUSION

For the foregoing reasons, Urena's motion for judgment on the pleadings is granted in part, the Commissioner's cross-motion is denied, and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g).  On remand, the ALJ is instructed to take the following actions:

(1)    fully develop the record as to Urena's treating psychiatrist Dr. Nunez;

(2)    assess the weight that should be given to Dr. Nunez's opinion upon a complete record and state explicitly what weight is being given to Dr. Nunez's opinion;

(3)    consider and weigh all the medical opinion evidence in the record with respect to the nature and severity of Urena's mental impairment in order to properly assess whether Urena has been under a disability since January 1, 2009;

(4)    hold a new hearing at which the ALJ shall complete the necessary five-step analysis to determine Urena's eligibility for benefits; and

(5)    render a decision within 120 days of the date of this Opinion and Order.

The Clerk is respectfully directed to close Docket Numbers 19 and 27, and enter judgment granting Urena's motion in part and denying the Commissioner's cross-motion, and to reverse the determination of the Commissioner and remand this case for further administrative proceedings.

**SO ORDERED.**

Dated: April 19, 2019
      New York, New York

JAMES L. COTT
United States Magistrate Judge